UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRAVIS HEEG, et al.,

      Plaintiffs,

                                  Case No. 1:21-cv-796

v.

                                  Hon. Hala Y. Jarbou

UNITED ELECTRICAL CONTRACTORS,
INC.,

      Defendant.
_____/

## OPINION

Plaintiffs Andrew Crampton, Travis Heeg, Richard Johnson, Evan Kopke, Timothy Nolen, Dalton Parish, and Marius Richardson are electrical workers formerly employed by Defendant United Electrical Contractors, Inc. ("UEC"), based in Lansing, Michigan. They brought this action asserting violations by UEC of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq.[1] Plaintiffs claim that UEC did not properly compensate them for time worked. Before the Court are the following motions: Plaintiffs' renewed motion to amend or clarify the Court's order granting conditional certification of a collective action (ECF No. 100); UEC's motion to decertify the collective action (ECF No. 113); and UEC's motion for partial summary judgment (ECF No. 114). For the reasons herein, the Court will grant Plaintiffs' motion to amend in part, deny UEC's motion to decertify, and grant UEC's motion for partial summary judgment in part.

---

[1]Plaintiffs also asserted violations of Michigan's Workforce Opportunity Wage Act (WOWA), Mich. Comp. Laws § 408.411, et seq., but the parties stipulated to dismiss that claim. (*See* ECF No. 88.)

# I. BACKGROUND

UEC, which has offices in Lansing and Livonia, Michigan, is an electrical contractor that works on construction sites throughout the State of Michigan.  It employed Plaintiffs and other electrical workers, paying them on an hourly basis.  There are four types of "electrical workers" employed by UEC: apprentices, journeymen, foremen, and laborers.  (*See* Peebles[2] Decl. ¶¶ 3-4, ECF No. 15-2.)  Each type has its own job responsibilities and rate of pay.

Plaintiff Crampton worked for UEC as a journeyman and foreman from September 2016 to February 2021.  (Crampton Decl. ¶ 2, ECF No. 9-4.)  Plaintiff Heeg worked for UEC as an apprentice from November 2016 through November 2020.   (Heeg Decl. ¶ 2, ECF No. 9-1.) Plaintiff Johnson worked for UEC as a journeyman and foreman from April 2013 to October 2020. (Johnson Decl. ¶ 2, ECF No. 9-7.)  Plaintiff Kopke worked for UEC as an apprentice from May 2017 to February 2021.  (Kopke Decl. ¶ 2, ECF No. 9-3.)  Plaintiff Parish worked for UEC as an apprentice from March 2020 to March 2021.  (Parish Decl. ¶ 2, ECF No. 9-5.)  Plaintiff Nolen worked for UEC as a journeyman and foreman from January 2018 to January 2021.  (Nolen Decl. ¶ 2, ECF No. 9-6.)  Plaintiff Richardson worked for UEC as an apprentice from January 2020 through October 2020.  (M. Richardson Decl. ¶ 2, ECF No. 9-2.)

In their complaint, Plaintiffs assert five violations of the FLSA: (1) unpaid shop time and travel time; (2) undercompensated overtime pay due to a "per diem" policy; (3) unpaid training; (4) unpaid print review; and (5) unpaid apprenticeship training.

## A. Unpaid Shop Time and Travel Time

Plaintiffs contend that UEC required them to report to UEC's main office in Lansing (the "Shop") several times per week in order to load materials and tools into a vehicle and then travel

---

[2] Robert Peebles was UEC's Vice President.

to the job site.  UEC did not pay them for the time spent loading, or for the time it took them to travel to the job site after loading; UEC considered the time of their arrival at the job site as the start of their compensable workday.  And at the end of the workday, UEC would require them to travel back to the Shop to unload materials or tools.  UEC would not pay them for the time traveling back to the shop or for the time unloading the vehicle.

### B. Improperly Calculated Hourly Rate ("*Per Diem*")

Plaintiffs contend, and UEC acknowledges, that UEC had a policy of paying its electrical workers an extra $2 per hour as a "*per diem*" when working at a job site more than sixty miles from the shop.  This *per diem* did not reimburse Plaintiffs for food and other expenses; it was simply an addition to their hourly pay.  However, UEC did not include this extra pay when determining Plaintiffs' regular hourly rate for purposes of calculating overtime pay.

### C. Unpaid Mandatory Training

Plaintiffs contend that UEC required them to complete online safety training modules outside of work and did not compensate them for the time spent undergoing this training.

### D. Unpaid Print Review

Plaintiffs contend that UEC required its electrical workers, particularly those working as foremen, to review job prints outside of normal working hours to prepare for the week's work, without compensation.

### E. Unpaid Apprenticeship Training

Finally, Plaintiffs contend that UEC required its apprentices to undergo apprenticeship training without paying them for it and without an apprenticeship agreement required by law.

## II. PROCEDURAL HISTORY

### A. Plaintiffs file their complaint (September 10, 2021).

When Plaintiffs filed their complaint in September 2021, none of them were still employed by UEC.  (*See* Compl. ¶¶ 1-8, ECF No. 1.)  They purported to bring a collective action "on behalf of a class of similarly situated individuals, known and unknown, who were employed by UEC as Foremen, Journeymen Electricians, and Apprentice Electricians."  (*Id.* at 4.)  Along with the complaint, each Plaintiff filed signed notices of consent to join the action.  (*See* Notices of Consent, ECF No. 1, PageID.24-37.)

### B. Plaintiffs ask Court to conditionally "certify" a collective action (November 2021).

In November 2021, Plaintiffs asked the Court to conditionally "certify" an FLSA collective action consisting of

> a class of similarly situated individuals, known and unknown, who were employed by Defendant as *electricians*, including Apprentices, Journeymen, and Foremen (collectively "Electrical Workers"), and who were deprived of overtime for hours worked in excess of forty hours a week *over the course of the last three years*.

(Pls.' Br. in Supp. of Mot. for Conditional Certification 3, ECF No. 9 (emphases added).)

At the time, the Court of Appeals described the FLSA collective action "certification" process as follows:

> To participate in FLSA collective actions, "all plaintiffs must signal in writing their affirmative consent to participate in the action."  *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 546 (6th Cir. 2006).  Only "similarly situated" persons may opt in to such actions.  *Id.*  Courts typically bifurcate certification of FLSA collective action cases.  At the notice stage, conditional certification may be given along with judicial authorization to notify similarly situated employees of the action.  *Id.*  Once discovery has concluded, the district court—with more information on which to base its decision and thus under a more exacting standard—looks more closely at whether the members of the class are similarly situated.  *Id.* at 547.

*Monroe v. FTS USA, LLC*, 860 F.3d 389, 397 (6th Cir. 2017).  Thus, at the initial stage, Plaintiffs were required to make only a "modest factual showing" that they were similarly situated with

potential opt-in plaintiffs.  *See Clark v. A&L Homecare & Training, LLC*, 68 F.4th 1003, 1008 (6th Cir. 2023).  At the next stage, when discovery was complete, the Court would decide whether to grant "'final certification' for the case to proceed as a collective action."  *Id.*

### C. The Court grants Plaintiffs' motion for conditional certification (May 2022).

In May 2022, the Court granted Plaintiffs' motion and conditionally "certified" a collective action for the purpose of allowing Plaintiffs to conduct discovery about, and to send notice to, the following potential opt-in plaintiffs:

> Individuals employed by Defendant as electricians, including Apprentices, Journeymen, and Foremen, and who were deprived of overtime for hours worked in excess of forty hours a week *over the course of the three years before Plaintiffs filed their complaint*.

(5/10/2022 Order, ECF No. 18 (emphasis added).)  When granting the motion, the Court flagged a potential issue about "an additional category of electrical worker called 'Laborer,'"; according to UEC's Vice President, Robert Peebles, Laborers are "'non-electrical workers'" because they "'do not perform any electrical tasks.'"  (5/10/2022 Op. 2 n.1, ECF No. 17 (quoting Peebles Decl. ¶ 4).)

### D. The parties engage in discovery about the potential opt-in plaintiffs.

Early on in the discovery process, before the Court's May 10, 2022 order approving notice to potential plaintiffs, Plaintiffs' discovery requests repeatedly limited themselves to a specific time period, i.e., "the three years immediately preceding the date of Plaintiffs' complaint" or "a period of time beginning 3 years prior to the filing of Plaintiffs' complaint."  (*See* 1/24/2022 Pls.' 1st Set of Reqs. to Produce, ECF No. 116-2, PageID.3261, 3262, 3264, 3265, 3266.)  Likewise, in its responses, UEC repeatedly indicated that it considered the relevant time period as the three years preceding Plaintiffs' complaint.  (*See, e.g.*, 8/5/2022 Def.'s Suppl. Resp. to Pls.' 1st Set of Reqs. to Produce, ECF No. 48-5, PageID.809, 811.)

Plaintiffs also asked UEC to provide a list of potential opt-in plaintiffs; however, UEC initially refused to provide one.  Finally, in June 2022, Plaintiffs moved to compel UEC to provide a list of "all individuals employed by Defendant as electricians, including Apprentices, Journeymen, and Foremen, from September 10, 2018 to present."  (*See* Ex. I to Pls.' Mot. to Compel, Interrog. No. 8, ECF No. 23-10, PageID.481.)  On August 2, 2022, UEC provided a list of employees from September 10, 2018 to September 10, 2021, with address information redacted for individuals who had purportedly waived their right to participate in the case.  (8/1/2022 Def.'s Answers to Pls.' 2d Set of Interrogs., ECF No. 34-2, PageID.684.)

**E. UEC discloses an unredacted list of potential opt-in plaintiffs (September 2022).**

On September 23, 2022, four and a half months after the Court's order approving notice to potential plaintiffs, UEC finally agreed to provide a list of "putative class members" with address information *un*redacted for all individuals on the list.  (*See* 9/23/2022 Proposed Stip. & Order 2, ECF No. 39.)  UEC apparently sent that list to Plaintiffs on September 27, 2022.  (*See* Pls.' Mot. to Am. Order for Class Certification 4, ECF No. 57.)

**F. Plaintiffs send notice to potential opt-in plaintiffs (October 2022).**

After receiving the unredacted list, Plaintiffs sent opt-in notices to the individuals on that list.  The notices indicated that the opt-in period would expire on November 28, 2022.  (*See* Notice, ECF No. 48-8, PageID.830.)

**G. Plaintiffs express concerns about the scope of the list of potential plaintiffs (November 2022).**

In November 2022, UEC again reiterated to Plaintiffs by email that it interpreted the Court's certification order as applying only to the period of time during "the three years before Plaintiffs filed their Complaint."  (11/25/2022 Cessante Email, ECF No. 48-3, PageID.796.)  UEC also indicated, apparently for the first time, that it had excluded from its list a group of employees

it called "Laborers" because the Court's order referred to "electricians" and UEC contended that Laborers were not employed by UEC "as electricians." (11/17/2022 Cessante Email, ECF No. 48-3, PageID.799.) Plaintiffs expressed concerns with the foregoing limitations, but it did not immediately raise those concerns with this Court. (*See* 11/17/2022 Fetter Email, ECF No. 48-3, PageID.798.)

After Plaintiffs received signed consent forms from UEC's employees, Plaintiffs resisted UEC's requests for information regarding the individuals who had returned those forms to Plaintiffs' counsel. In January 2023, UEC moved to dismiss the case under Rule 41 because Plaintiffs had not provided UEC with copies of any signed opt-in consent forms and UEC believed that Plaintiffs' counsel had coordinated with the electrical workers' union to distribute the opt-in notices.

### H. Plaintiffs ask to amend the Court's conditional "certification" order (February 2023).

On February 9, 2023, Plaintiffs asked the Court to amend or clarify the class definition, asserting that the list of potential class members that it had received from UEC in September 2022 was "incomplete." (Pls.' Mot. to Am. Order for Conditional Class Certification 4.) According to Plaintiffs, UEC had "admitted" only two months earlier, on November 29, 2022, that its list only included individuals employed by it from September 10, 2018, to September 10, 2021. (*Id.* at 6.) In addition, Plaintiffs contended that UEC had omitted from its list the group of workers that UEC classified as "Laborers" because they performed no electrical work, at least according to UEC. (*Id.* at 5.) Plaintiffs, however, asserted that their intent all along was to bring an action that encompassed all electrical workers employed by UEC since September 10, 2018, including both (1) employees performing electrical work that UEC had labeled as Laborers and (2) employees

7

performing electrical work for UEC on or after September 10, 2021, the date of Plaintiffs' complaint. (*See id.* at 13.)

While Plaintiffs' motion to amend was pending, the Court extended the discovery and dispositive motion deadlines to March 30, 2023, and April 27, 2023, respectively. (2/22/2023 Order, ECF No. 62.) Meanwhile, Plaintiffs resisted UEC's attempt to obtain additional written discovery regarding the opt-in plaintiffs, contending that such discovery was "unduly burdensome" and unnecessary. (*See* Def.'s Mot. to Compel, ECF No. 71; Pls.' Resp. to Mot. to Compel 6, ECF No. 77.) Plaintiffs also objected to UEC's attempt to schedule depositions for opt-in plaintiffs. (Pls.' Mot. to Quash, ECF No. 73.) And strangely, Plaintiffs' counsel held onto the signed consent forms it had received and did not file them with the Court.

The magistrate judge eventually ordered Plaintiffs to respond to written discovery requests for four opt-in plaintiffs who had been selected for deposition, i.e., Daniel Ayotte, Joseph Essenberg, Jason Gay, and Kevin Winiarski. (4/18/2023 Order, ECF No. 82.) And in its fourth amended case management order, the Court reset the dispositive motion deadline to May 30, 2023. (4/10/2023 Case Management Order, ECF No. 80.)

**I. The Court of Appeals changes the standard for approving a collective action.**

The Court scheduled a hearing on Plaintiffs' motion to amend the class definition for May 30, 2023. Less than two weeks before that hearing, the Court of Appeals for the Sixth Circuit entered its decision in *Clark*, which altered the procedure for handling collective actions under the FLSA. *See Clark*, 68 F.4th at 1009. In *Clark*, the Court of Appeals made clear that "the term 'certification' has no place in FLSA actions." *Id.* The Court certifies class actions under Rule 23, but that rule does not apply to collective actions under the FLSA. Unlike a class action, a collective action is not representative. *Id.* Instead, "similarly situated employees who join an FLSA action become parties with 'the same status in relation to the claims of the lawsuit as do the named

plaintiffs.'" *Id.* (quoting *Canaday v. Anthem Cos.*, 9 F.4th 392, 402-03 (6th Cir. 2021)). The Court's role in such a case is to "facilitate notice" to similarly situated employees and then add the parties who consent to join the action after the Court determines that they are, in fact, similarly situated. *Id.* at 1009-11.

According to *Clark*, when facilitating notice, the Court's decision is "analogous to a . . . decision whether to grant a preliminary injunction." *Id.* at 1010. Both decisions are "provisional, in the sense that the court renders a final decision on the underlying issue . . . only after the record for that issue is fully developed[.]" *Id.* at 1010-11. The underlying issue in an FLSA action is "whether [the] employees are similarly situated[.]" *Id.* at 1010 (quotation marks omitted). Also, "both decisions have immediate consequences for the parties." *Id.* at 1011. Accordingly, to obtain an order permitting notice to other employees, FLSA plaintiffs must "show a 'strong likelihood' that those employees are similarly situated to the [named] plaintiffs themselves." *Id.* at 1011. And then later, when the record is more developed, the Court must make a "final similarity determination." *Id.* at 1017 (White, J., concurring in part).

### J. The Court directs Plaintiffs to file a renewed motion to amend (May 2023).

At the hearing on May 30, 2023, the Court denied Plaintiffs' motion to amend without prejudice and directed Plaintiffs to file a renewed motion that addressed the standard in *Clark*. The Court also denied UEC's motion for dismissal of the case under Rule 41.

### K. Plaintiffs file the consent forms for opt-in plaintiffs (May 31, 2023).

On May 31, 2023, Plaintiffs finally filed opt-in consent forms for the following employees: Daniel Ayotte, Paul Bitnell, Eric Burch, Anthony Butler, Paris Carpenter, Joseph Essenberg, David Garver II, Jason Gay, Roscoe George, Graham Gilbert, Jason Hufnagel, Jason James, Albert Duwayne Laveque, Mitchell Mulvenna, Vance Murray, Steven Pittman, Chase Render, Beau Rich, Tyler Richardson, Jordan Shank, James Steingreabrer, Jacob Steinmetz, Lavell Washington,

Travis Williams, and Kevin Winiarski (collectively, "Opt-In Plaintiffs").  (Consent Forms, ECF No. 96-1; *see* Heeg Opt-In Chart, ECF No. 114-29.)

> **L. Plaintiffs file a renewed motion to amend; UEC seeks summary judgment and "decertification" of the collective action.**

Plaintiffs subsequently filed their renewed motion to amend and UEC filed its motion to "decertify" the collection action, as well as a motion for partial summary judgment.

### III. DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

#### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

#### B. FLSA Claims

The FLSA generally requires employers to compensate their hourly employees for time worked.  29 U.S.C. §§ 206, 207.  It also requires employers to compensate their employees at one and a half times their regular hourly rate for work exceeding forty hours per week.  29 U.S.C. § 207(a)(1).  Here, Plaintiffs have consistently testified that, as far as UEC was concerned, their compensable work hours began when they arrived at a job site and ended when they left that site. Many of Plaintiffs' supervisors at UEC (i.e., project managers and foremen) expressly told

Plaintiffs that they should record the time they arrived at the job site as their start time on their timesheets.  (*See, e.g.*, Johnson Dep. 112, 115, 118-19;[3] Heeg Dep. 117-18;[4] M. Richardson Dep. 160, 181-82;[5] Nolen Dep. 158;[6] Crampton Dep. 77;[7] Ayotte Dep. 63-64.[8])  Similarly, UEC's Employee Handbook from 2019 stated,

> All employees are required to report to their assigned jobsite on their own time and to furnish their own transportation.  If a company vehicle is going to a job site, employees are permitted to ride along with no compensation for their ride time.  *An employee's time starts when they arrive at the job site and begin working*.  A per diem may be paid on jobs over sixty miles from the shop. . . .

(UEC Employee Handbook (June 2019), ECF No. 15-2, PageID.197 (emphasis added).)[9]  UEC's foremen, who were responsible for reviewing the timesheets completed by other workers (Crampton Dep. 77; Essenberg Dep. 21;[10] Tolliver Dep. 80;[11] Peebles Dep. 175, 182[12]), enforced this rule.  Foremen could make changes to those timesheets to reflect only the hours worked on the job site.  For instance, when Crampton was a foreman, he would review timesheets to look for "cheaters" who had not been present on the job site for a full 8 hours.  (Crampton Dep. 78.)  If necessary, he would correct the hours recorded.  (*Id.* at 77-78.)  According to Jeremy Tolliver, a project manager for UEC, UEC did not want its employees working overtime because that labor

---

[3] Excerpts of Plaintiff Johnson's deposition are at ECF Nos. 103-5, 113-7, 114-13, 126-6.

[4] Excerpts of Plaintiff Heeg's deposition are at ECF Nos. 103-6, 113-2, 114-2, 126-7.

[5] Excerpts of Plaintiff Richardson's deposition are at ECF Nos. 104-2, 113-8, 114-15, 126-10.

[6] Excerpts of Plaintiff Nolen's deposition are at ECF Nos. 104-5, 113-6, 114-11, 126-12, 130-10.

[7] Excerpts of Plaintiff Crampton's deposition are at ECF Nos. 104-12, 113-4, 114-9, 126-9, 130-8.

[8] Excerpts of Opt-In Plaintiff Ayotte's deposition are at ECF Nos. 103-2, 104-8, 113-9, 114-18, 126-16.

[9] UEC argues that this provision "merely addresses job sites more than 60 miles from UEC's Shop and while riding in a company vehicle."  (Def.'s Summ. J. Br. 10, ECF No. 136.)  That is one possible interpretation; it is not the only one.

[10] Excerpts of Opt-In Plaintiff Essenberg's deposition are at ECF Nos. 103-4, 104-6, 113-10, 114-19, 126-13.

[11] Jeremy Tolliver was a project manager for UEC.  His deposition excerpts are at ECF Nos. 104-10, 126-3.

[12] The deposition excerpts of Vice President Peebles are at ECF Nos. 104-11, 114-30, 126-4.

cost is "additional money" that is not accounted for in the company's bid for a project.  (Tolliver Dep. 70.)  Vice President Peebles would track overtime and "flag" it as a "problem" for project managers.  (*Id.*)

Nevertheless, Plaintiffs' supervisors regularly instructed or expected Plaintiffs to perform additional tasks off the job site that were not recorded on timesheets and were not compensated, including loading or unloading materials and tools at the Shop, completing training modules, and reviewing prints.  UEC's Employee Handbook reinforced this expectation, instructing that when an employee records their time on a timesheet, "[a]ll time worked is to be *assigned to a job*," and that "[i]t is the employee's responsibility to ensure that *job numbers*, hours worked, travel time, and material reimbursements have been recorded accurately."  (UEC Employee Handbook (2019), PageID.193 (emphases added).)  Each job site had a job number and "cost codes" associated with it.  (Tolliver Dep. 72.)  Tolliver testified that he was not aware of any "cost code" for work outside the job site, such as loading or unloading materials, undergoing training, or traveling to a job site.  (*Id.* at 75-76.)  He contended that any time worked at the Shop would be considered "overhead" and that employees could write "shop" on their timesheet.  (*Id.* at 76.)  However, there is no evidence that anyone communicated this possibility to Plaintiffs, at least as far as loading and unloading tools and materials at the Shop were concerned.[13]  In fact, as explained below, many Plaintiffs testified that their supervisors expressly told them they could not receive compensation for certain tasks performed off the job site.  And even Tolliver agreed that an employee's time started when they arrived on the job site and ended when they left that site.  (*Id.* at 147.)

---

[13] UEC offers evidence that some Plaintiffs reported "Shop" or "Office" time on their timesheets.  (*See* Timesheets, ECF No. 15-2, PageID.246-255.)  However, it is not clear what work was performed during these times or whether it corresponds to any of the uncompensated work at issue in this case.

## 1. Loading / Unloading Tools and Materials and Travel Time

As indicated, one of the tasks Plaintiffs' supervisors asked them to perform was loading tools or materials at the Shop before going to the job site in the morning and unloading tools or materials at the Shop after leaving the job site at the end of the day.  All Plaintiffs testified that they performed this work on at least some jobs and did not receive compensation for this time. (*See* Crampton Dep. 69, 71, 109; Heeg Dep. 96, 100, 111-13; Johnson Dep. 151-52; Kopke Dep. 155, 162-64;[14] Nolen Dep. 131-32; Parish Dep. 110, 118;[15] M. Richardson Dep. 144-46, 153.) The four Opt-In Plaintiffs who were deposed also did the same work without receiving compensation for it.  (Ayotte Dep. 32, 53; Gay Dep. 36-38, 48;[16] Essenberg Dep. 36, 39, 43; Winiarski Dep. 26, 28, 33.[17])  Almost all of these employees testified that their superiors (project managers or foremen) expected or specifically instructed them to perform these tasks.  UEC's Employee Handbook also suggested that Plaintiffs were obligated to perform this work.  It instructed employees to return "excess materials . . . to the warehouse as soon as possible."  (UEC Employee Handbook (2019), PageID.185.)  It also instructed employees to return "large tools . . . to the warehouse or on-site storage," "when not needed for a period of time[.]"  (*Id.*)  There was even a process for electrical workers to pick up tools and materials from the Shop at the start of the day.  Foremen or project managers would contact the Shop ahead of time to arrange for materials to be picked up by other electrical workers.  (Crampton Dep. 112; Essenberg Dep. 37-38; Johnson Dep. 141, 148.)  And when necessary, Plaintiffs would "check out" tools from the Shop to bring to the job site.  (Heeg Dep. 100; Crampton Dep. 69; Essenberg Dep. 39-40.)

[14] Excerpts of Plaintiff Kopke's deposition are at ECF Nos. 103-7, 104-3, 113-5, 114-10, 126-8, 130-9.

[15] Excerpts of Plaintiff Parish's deposition are at ECF Nos. 104-4, 113-3, 114-6, 126-11, 130-5.

[16] Excerpts of Opt-In Plaintiff Gay's deposition are at ECF Nos. 103-3, 113-11, 114-20, 126-15.

[17] Excerpts of Opt-In Plaintiff Winiarski's deposition are at ECF Nos. 104-7, 113-12, 114-21, 126-14.

UEC maintains that its policies prohibited its employees from retrieving, transporting, or returning tools and materials to and from the Shop.  In the same section of the Employee Handbook that refers to when an employee's time "starts," it states:

> It is company policy that UEC's vendor deliver materials to the job site.  In the event that materials are required from UEC's inventory, a requisition must be made to the warehouse personnel for on-site delivery.

(UEC Employee Handbook (2019), PageID.197.)  According to Vice President Peebles, "UEC employs a Shop Manager and delivery drivers who are responsible for delivering materials from the Shop to the job site so that employees do not have to pick-up or retrieve materials from the corporate office (or Shop)."  (Peebles Decl. ¶ 21.)

Notably, the handbook did not expressly *prohibit* employees like Plaintiffs from delivering tools or materials to a job site.  And at any rate, even if UEC's handbook prohibited Plaintiffs from performing this work, Plaintiffs' testimony indicates that UEC's managers did not follow or enforce this policy.

### 2. *Per Diem*

UEC had a policy of paying a "*per diem*" to its employees assigned to job sites that were located more the sixty miles from the Shop.  (Peebles Decl. ¶ 18.)  Apparently, this per diem was not a lump sum payment.  Instead, it was an increase in the hourly rate.  UEC acknowledges that it did not account for this additional payment when calculating its employees' regular rate for purposes of paying overtime.  (*Id.* ¶ 19; Peebles Dep. 11.)

On the other hand, UEC presents evidence that Opt-In Plaintiffs Rich, Shank, and George were never assigned to jobs more than 60 miles from the Shop.  (Krauss Decl. ¶ 13, ECF No. 114-5.)  If so, the *per diem* claim does not apply to them.  Plaintiffs offer no evidence suggesting otherwise.  Accordingly, the Court will dismiss the *per diem* claims by Opt-In Plaintiffs Rich, Shank, and George.

### 3. Online Training

Another task UEC expected its electrical workers to perform outside regular work hours was completing online safety training modules.  (Ayotte Dep. 52; Essenberg Dep. 57, 62; Johnson Dep. 218.)  Multiple Plaintiffs and Opt-In Plaintiffs testified that they were told to complete these modules at home or on their own time; they were not permitted to watch these videos on the job site or at work.  (*See, e.g.*, Heeg Dep. 145; Kopke Dep. 211; Johnson Dep. 219; Parish Dep. 131.)  Consistent with this testimony, Doug Sleep, UEC's Director of Operations and Safety, circulated an email to UEC employees in April 2020, asking them to "volunteer" their time to complete the modules "at [their] leisure."  (4/1/2020 Sleep Email, ECF No. 126-19, PageID.3682.)  Similarly, in 2017, Sleep sent an email to Kopke, telling him, "We have a very strict training policy here at UEC.  Hopefully this weekend in your down time you can get started on our Safety videos online?"  (5/10/2017 Sleep Email, ECF No. 102-2, PageID.2253.)  UEC kept a record of how many of these modules each of its employees completed, put that record on employee performance reviews (Sleep Dep. 108;[18] Heeg Dep. 152-54), and discussed it with employees during those reviews (Ayotte Dep. 50-51).

### 4. Reviewing Prints

Many, but not all,[19] Plaintiffs and Opt-In Plaintiffs testified that UEC's project managers expected them to review "prints" or plans of a particular job site on their own time, i.e., without compensation.  (*See, e.g.*, Crampton Dep. 149; Ayotte Dep. 38, 41; Johnson Dep. 190-92, 195; Essenberg Dep. 63-64; Kopke Dep. 134; Parish Dep. 96-97.)  Plaintiff Johnson said he specifically complained about this issue to Project Manager Wayne Taylor, who said, "I can't do anything

---

[18] Excerpts of Sleep's deposition are at ECF Nos. 102-3, 126-5.

[19] Generally speaking, this claim applies only to those employees who worked as foremen.

15

[about it]."  (Johnson Dep. 197.)  Two employees, Crampton and Kopke, testified that UEC paid them for this work only when they reviewed prints in the Shop.  (Crampton Dep. 150; Kopke Dep. 144-46.)  Similarly, Nolen testified that UEC paid him for reviewing prints when he did this work on the job site or at the Shop.  (Nolen Dep. 124-25.)

### 5. Apprenticeship Training

All Opt-In Plaintiffs who were deposed, and all but one of the seven Plaintiffs, admitted in their depositions that they do not seek compensation for apprenticeship training.  Kopke, the only Plaintiff who testified otherwise, acknowledged that he signed an agreement with UEC in which he agreed that he would not be paid by UEC for apprenticeship training.  (Kopke Dep. 202, 204, 207, 209.)  He took some training classes at Lansing Community College, but he was not sure whether he should be compensated for those classes.  (*Id.* at 122.)  Consequently, UEC seeks summary judgment for this claim.

Plaintiffs appear to have abandoned this claim.  They do not meaningfully respond to the evidence discussed by UEC.  Plaintiffs assert that Plaintiff Richardson participated in apprenticeship training; however, Richardson testified that he does not seek compensation for that training.  (M. Richardson Dep. 223-25.)  Accordingly, because Plaintiffs fail to provide evidence supporting their apprenticeship claims, the Court will grant summary judgment to UEC on this component of Plaintiffs' FLSA claims.

### C. Willfulness

UEC argues that its actions were not "willful" under the FLSA.  "There is a two-year statute of limitations for an ordinary violation under the FLSA.  When the violation is willful, however, the statute of limitations is three years."  *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 414 (6th Cir. 2022) (citation omitted).  Willfulness is shown by proving that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute."  *Id.* (quoting

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  For example, the Court of Appeals "found an employer to have known or acted with reckless disregard where the employer 'had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his assurance of future compliance with the FLSA.'" *Id.* at 414-15 (quoting *Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 473-74 (6th Cir. 1999)); *cf. Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1064 n.6 (6th Cir. 2019) (affirming district court's conclusion that employer's conduct was not willful where the defendant had not been subjected to previous investigations by the Department of Labor and had not promised to comply with the FLSA in the future).  An employer's attempt to conceal evidence of violations might also suggest willfulness.  *Id.* at 417.  But evidence of unreasonable or negligent conduct by an employer "in determining its legal obligation" is not sufficient to show willfulness.  *See McLaughlin*, 486 U.S. at 134, 135 n.13.  Neither is "mere knowledge of the [FLSA] or its potential applicability[.]" *Carberry v. Monarch Mktg. Sys., Inc.*, 30 F. App'x 389, 395 (6th Cir. 2002).  "Congress intended to draw a significant distinction between ordinary violations and willful violations." *McLaughlin*, 486 U.S. at 132.  "[A] standard that merely requires that an employer knew that the FLSA 'was in the picture' . . . virtually obliterates any distinction between willful and nonwillful violations." *Id.*

Here, Plaintiffs consistently testified that, as far as UEC was concerned, their recordable work hours began when they arrived at their job site and ended when they left.  That is what their supervisors told them and that is what UEC's Employee Handbook suggested.  For reasons discussed below, a jury could find that these same supervisors knew that Plaintiffs were performing compensable work off the job site that was not recorded on timesheets and for which Plaintiffs would not receive any compensation.  And for similar reasons, a jury could find that UEC's failure to compensate Plaintiffs for this time was willful.  *See Elwell v. Univ. Hosps. Home Care Servs.*,

276 F.3d 832, 844 (6th Cir. 2002) ("[A]n employer's recordkeeping practices may . . . corroborate

an employee's claims that the employer acted willfully in failing to compensate for overtime.  For

example, the fact that an employer knowingly under-reported its employee's work hours could

suggest to a jury that the employer was attempting to conceal its failure to pay overtime from

regulators, or was acting to eliminate evidence that might later be used against it in a suit by one

of its employees." (citation omitted)).  Indeed, it does not take much knowledge or awareness of

the FLSA to know that employees must be compensated for their work.

### 1. Loading / Unloading and Travel Time

According to Plaintiffs' testimony, UEC's supervisors were certainly aware of the work by

Plaintiffs and Opt-In Plaintiffs loading and unloading materials and tools at the Shop before and

after working at the job site, as the supervisors were the ones who instructed Plaintiffs and Opt-In

Plaintiffs to perform these tasks.  Also, Vice President Peebles worked in the same building as the

Shop (Peebles Dep. 297), and Plaintiffs testified that he was present when they performed these

tasks.  (Heeg Dep. 106; Nolen Dep. 152.)  Thus, a jury could infer that he was aware of this work

as well.

A jury could also infer that UEC was aware of, and recklessly disregarded, its obligation

to compensate its employees for the time performing these tasks, as well as the travel time

associated with them.  As discussed above, UEC's Employee Handbook stated:

> It is company policy that UEC's vendor deliver materials to the job site.  In the
> event that materials are required from UEC's inventory, a requisition must be made
> to the warehouse personnel for on-site delivery.

(UEC Employee Handbook (2019), PageID.197.)  In other words, UEC had a written policy for

using vendors or warehouse personnel to deliver materials to the job site, but UEC did not follow

it.  Instead, it directed Plaintiffs to do this work.  The existence of this particular policy, coupled

with the handbook's written expectation that an electrical worker's time started when they arrived

at the job site, suggests UEC was aware that delivering materials or tools to a job site would be compensable work.  Accordingly, a jury could conclude that UEC showed willful or reckless disregard for its obligations under the FLSA.

UEC relies on *Claeys v. Gandalf, Ltd.*, 303 F. Supp. 2d 890 (S.D. Ohio Jan. 23, 2004), in which a district court found insufficient evidence of willfulness where the plaintiff indicated that he spoke with his superior, who told the plaintiff that he would not be entitled to overtime pay.  *Id.* at 893.  That evidence was insufficient, in part, because the employer paid the plaintiff a commission.  That form of compensation is exempt from overtime pay under the FLSA.  *Id.* at 894.  *Claeys* is distinguishable because UEC offers no similar defense for not compensating its employees here.  UEC does not contend that it had similar reasons for believing that Plaintiffs' labor off the job site was not compensable.

UEC also relies on *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311 (S.D.N.Y. 2001), where the plaintiff "only speculate[d] that [his employer] willfully attempted to conceal plaintiff's eligibility for overtime pay by hiring him as an independent contractor."  *Id.* at 323.  The plaintiff offered no "concrete evidence in the record" to support this conclusion.  *Id.* at 324.  In contrast, as discussed above, Plaintiffs have offered evidence of willfulness.  Thus, *Gustafson* is distinguishable.

## 2. *Per Diem*

Peebles testified that UEC did not account for the per diem in its overtime calculation because its software program did not include this payment in the overtime calculation.  (Peebles Dep. 11.)  That miscalculation is somewhat understandable given that UEC erroneously referred to the increase in hourly pay as a "*per diem*," which means "for each day," rather than "for each hour."  *See Per Diem*, *Black's Law Dictionary* (11th ed. 2019).  Plaintiffs offer no evidence from which to conclude that this miscalculation was willful under the FLSA.  Indeed, as discussed in

more detail below, when UEC first learned about the issue *before* Plaintiffs filed their complaint, it took steps to correct it by reimbursing employees.

### 3. Safety Training

Plaintiffs' supervisors were also aware that Plaintiffs and Opt-In Plaintiffs were completing the safety training modules.  The supervisors instructed their employees to complete these modules (*see* Winiarski Dep. 42; Kopke Dep. 211; Heeg Dep. 147, 145) and the number completed appeared on the employees' performance reviews (Sleep Dep. 108).  A jury could also infer that Plaintiffs' supervisors were aware that Plaintiffs were not receiving compensation for that time. Several Plaintiffs and Opt-In Plaintiffs testified that their supervisors told them to watch the videos at home, not on the job site or during work hours.  (Ayotte Dep. 52; Johnson Dep. 219; Heeg Dep. 145; Kopke Dep. 211; Parish Dep. 131.)  UEC also relayed this expectation during company-wide meetings.  (Heeg Dep. 145.)  Sleep's email encouraging UEC employees to "volunteer" their time to watch the training videos suggests that UEC was requiring its employees to perform work that would not be recorded on timesheets, and that it was aware that this time was compensable. Furthermore, at least one employee received compensation for his safety training because he completed it shortly before or after he started working for UEC.  (Nolen Dep. 13, 15, 122.)  And Peebles acknowledged that UEC would pay for training conducted in its Shop.  (Peebles Dep. 275-76.)  This disparate treatment likewise suggests that UEC recognized its obligation to compensate employees for time spent training, but recklessly or willfully disregarded that obligation for many of its employees.

### 4. Reviewing Prints

In comparison to the other tasks performed off the job site, there is less consistent evidence that UEC's supervisors were aware that its employees were reviewing prints at home without receiving compensation for that work.  Essenberg testified that this work was not mandatory, and

that management would not have known about it unless it was reported on timesheets.  (Essenberg Dep. 62, 65.)  Similarly, Kopke testified that no one specifically directed him to review prints on his own time or to not report it on timesheets; it was simply common practice.  (Kopke Dep. 134, 136.)  On the other hand, Crampton and Johnson testified that Project Manager Taylor told them to do that work on their own time.  (Crampton Dep. 149; Johnson Dep. 195.)  Johnson also complained about it to Taylor, who did nothing about it.  (Johnson Dep. 197.)  And Tolliver apparently "bragged" about "donating" his time on the weekend to review prints.  (Essenberg Dep. 63.)  Even Peebles acknowledged that UEC's foremen could review prints at home.  (Peebles Dep. 187.)  Coupled with evidence of UEC's general practice to compensate its employees only for work performed on the job site (or in the Shop), the foregoing evidence is sufficient for a finding of willfulness regarding this issue.

In summary, construing the evidence in Plaintiffs' favor, a jury could find that UEC's failure to pay Plaintiffs and Opt-In Plaintiffs for loading and loading materials and tools (and associated travel time to the job site), for completing training modules, and for reviewing prints off the job site was willful under the FLSA.  In contrast, a jury could not find that UEC's failure to include the *per diem* payments in its calculation of overtime pay was willful under the FLSA.

### D. Waiver

UEC argues that eleven of the Opt-In Plaintiffs cannot proceed with their FLSA claims in this action because they waived their right to do so, either by signing a written waiver or by accepting consideration offered by UEC in connection with receipt of the waiver form.  UEC contends that, in the summer or fall of 2021, it discovered that it was not accounting for the *per diem* payment when calculating its employees' overtime rate.  (*See* Peebles Dep. 214-16.)  It then attempted to correct the issue by sending reimbursement checks to affected employees along with a waiver.  The waiver states, in pertinent part:

> I . . . acknowledge and agree that, in consideration of the payment to me by UEC of the additional sum set forth in the attached, I waive my right to pursue and/or participate in any class or representative claims against UEC for any wage and hour disputes in court, arbitration, or other proceedings. Instead, I am voluntarily opting to decline to pursue and/or participate in any class or representative claims against UEC for any wage and hour dispute. Nothing contained herein shall prohibit me from filing any claims or charges in court or with a governmental agency on an individual basis.
>
> . . .
>
> I further acknowledge and agree that I have been provided with the opportunity to review this Acknowledgement and Waiver, including with counsel should I so choose, and that I am signing of my own free will and without any duress and coercion.

(*See* Acknowledgement & Waiver, ECF No. 114-5, PageID.3001.)  In October 2021, seven Opt-In Plaintiffs signed the waiver and another four cashed their checks.  (*See* Krauss Decl. ¶¶ 14-15, ECF No. 114-5.)

The Supreme Court has "held that employees may not, either prospectively or retrospectively, waive their FLSA rights to minimum wages, overtime, or liquidated damages." *Boaz v. FedEx Customer Info. Servs., Inc.*, 725 F.3d 603, 606 (6th Cir. 2013) (citing *D.A. Schulte, Inc. v. Gangi*, 328 U.S. 108, 114 (1946)).  Likewise, "a plaintiff's right to participate in a collective action cannot normally be waived."  *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 590 (6th Cir. 2014).

Waiver of a judicial forum for a collective FLSA claim in favor of arbitration may be permissible "only if the alternative forum 'allow[s] for the effective vindication of [the employee's] claim.'"  *Boaz*, 725 F.3d at 606.  However, the waiver here contains no arbitration clause.  It does preserve the right to bring an individual claim, but bringing an individual claim is not the same as proceeding in a collective action.  "*Boaz* is based on the general principle of striking down restrictions on the employees' FLSA rights that would have the effect of granting their employer an unfair advantage over its competitors." *Killion*, 761 F.3d at 592.  "Requiring an

employee to litigate on an individual basis" is just such an unfair advantage.  *Id.*  Thus, the waiver is invalid and unenforceable.

UEC argues that *Boaz* and *Killion* do not apply here because those cases involved "provisions contained in employment agreements that were not signed in the context of disputed claims."  (Def.'s Mot. for Summ. J. 26, ECF No. 114.)  In contrast, according to UEC, the waiver here was signed "in the context of resolving disputed claims," "as opposed to hypothetical, yet-to-be-liquidated claims[.]"  (*Id.* at 26-27.)  UEC does not explain why this distinction makes a difference here.  The waiver only purported to resolve one FLSA claim (the *per diem* calculation).  There is no evidence that the other claims at issue here, such as the failure to receive compensation for additional time worked, were resolved, addressed, or even discussed by the parties at the time of the waiver.  Thus, those claims were not in dispute by the parties.  Indeed, the concern identified in *Killion*—"discourag[ing] [an] employee from bringing a claim for overtime wages" by "having to litigate on an individual basis," *Killion,* 761 F.3d at 592—is still present where, as here, the employer gives its employee what the employee is already due under the FLSA for one FLSA claim in exchange for the waiver of other, potential FLSA claims.

Moreover, even as to the *per diem* claim, UEC's description of the circumstances is inaccurate.  None of the Opt-In Plaintiffs had joined this lawsuit or asserted any claims against UEC when they signed the waiver.  Instead, UEC apparently recognized its miscalculation and then offered to reimburse its employees.  Consequently, there was no dispute between the Opt-In Plaintiffs and UEC about the *per diem* calculation at the time of the waiver.

A similar situation arose in *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945).  There, an employer sent its former employees a payment and waiver after realizing that it had not paid them overtime compensation required by the FLSA.  *Id.* at 700.  An employee signed the waiver,

accepted the check, and then brought a claim for liquidated damages under the FLSA.  The Supreme Court permitted his claim to proceed in spite of the waiver because there was no "bona fide dispute between the parties as to liability" when the employee signed the waiver.  *Id.* at 703. The same logic applies here.  Accordingly, UEC's waiver argument is not persuasive.

Even if the waiver was enforceable, UEC faces another problem.  The waiver purports to restrict only "class or representative claims."  There are no class or representative claims pending in this lawsuit.  Class actions under Rule 23 are "fundamentally different from collective actions under the FLSA."  *Clark*, 68 F.4th at 1009 (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013)).  "Specifically, unlike a Rule 23 class action, an FLSA collective action is not representative[.]"  *Id.*; *see Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 173 (1989) (noting that Congress amended the FLSA in 1947 "for the purpose of . . . freeing employers of the burden of representative actions").  "[S]imilarly situated employees who join an FLSA action become parties with 'the same status in relation to the claims of the lawsuit as do the named plaintiffs.'" *Id.* (quoting *Canaday*, 9 F.4th at 402-03).  By opting into this action, Opt-In Plaintiffs are pursuing claims on their own behalf.  Accordingly, the FLSA claims in this suit are not class or representative claims.  Thus, on its face, the waiver does not apply.

In short, for all the foregoing reasons, the waiver does not prevent any individuals from proceeding with their FLSA claims in this case.  Instead, at most, the compensation that any plaintiffs received from UEC may offset the damages to which they may be entitled.

### E. Late Consent Forms

UEC argues that some Opt-In Plaintiffs should not be permitted to join the action because they returned their consent forms after the deadline for doing so.  The consent form indicated that Opt-In Plaintiffs should return their forms to Plaintiffs' counsel by November 28, 2022.  (Consent Form, ECF No. 114-28.)  A legal assistant for Plaintiffs' counsel avers that counsel received signed

consent forms for the following individuals before the close of business on November 28, 2022:

Ayotte, Bitnell, Burch, Butler, Carpenter, Essenberg, Gay, Garver, George, Gilbert, Hufnagel,

James, Laveque, Mulvenna, Murray, Pittman, Render, Rich, Tyler Richardson, Shank,

Steingreabrer, Washington, Williams, and Winiarski. (Mack Decl. ¶ 2, ECF No. 132-10.) Counsel

received forms from the other Opt-In Plaintiffs "prior to January 6, 2023." (*Id.* ¶ 3.)

> While the FLSA does not provide a standard under which a court should assess whether to permit untimely filed consent forms, courts generally balance the following factors: "(1) whether 'good cause' exists for the late submissions; (2) prejudice to the defendant; (3) how long after the deadline passed the consent forms were filed; (4) judicial economy; and (5) the remedial purposes of the FLSA."

*Pyfrom v. ContactUS, LLC*, No. 2:21-CV-4293, 2023 WL 32843, at *2 (S.D. Ohio Jan. 4, 2023)

(quoting *Heaps v. Safelite Sols., LLC*, No. 2:10-cv-729, 2011 WL 6749053, at *2 (S.D. Ohio Dec.

22, 2011)).

The Court concludes that the balance of factors weighs in favor of accepting the late

consent forms. On the one hand, Plaintiffs have not presented "cause" to justify the late submission

of the forms. On the other hand, UEC does not identify any meaningful prejudice from accepting

the late forms, which were late by approximately five weeks at most. Judicial economy and the

remedial purposes of the FLSA favor accepting them.

### F. Statute of Limitations

UEC argues that some claims are time-barred. For named plaintiffs, the FLSA provides

that an action "shall be considered to be commenced in the case of any individual claimant" when

"the complaint and his written consent to become a party plaintiff is filed . . . in the court in which

the action is brought[.]" 29 U.S.C. § 256(a). For opt-in plaintiffs, their case is considered to have

commenced "on the subsequent date on which [their] written consent is filed in the court[.]" *Id.*

§ 256(b); *Frye v. Baptist Mem'l Hosp., Inc.*, 495 F. App'x 669, 675 (6th Cir. 2012).

25

### 1. Named Plaintiffs

Plaintiffs Heeg, Parish, Crampton, Kopke, Nolen, Johnson, and Marius Richardson filed their consent forms on September 10, 2021, along with the complaint.  Thus, any FLSA claims by the Plaintiffs arising on or after September 10, 2018, are timely (assuming a fact-finder would conclude that UEC's violations were willful).  But because the Court has concluded that Plaintiffs have not shown willfulness with regard to the *per diem* violation, those claims are subject to the two-year statute of limitations.  Accordingly, the foregoing Plaintiffs are entitled to pursue such claims only to the extent they arose on or after September 10, 2019.

UEC has provided sworn declarations from the records custodian in its accounting department, Melinda Krauss.  One declaration provides dates for when Opt-In Plaintiffs were employed and the dates when UEC worked on particular job sites.  (*See* 2d Krauss Decl. ¶¶ 2-41, ECF No. 119-2.)  Plaintiffs identify no evidence to rebut these dates.  Accordingly, the Court finds that these dates are not disputed.

In another declaration, Krauss identifies where particular Plaintiffs and Opt-In Plaintiffs worked and the dates of that work.  (*See* Krauss Decl. ¶¶ 2-11, ECF No. 114-5.)  The Court will not resolve any disputes over which individuals worked on which job sites.  Krauss's declaration alludes to such disputes.  (*See id.* ¶ 4 ("UEC has no record of a job called "Indian Harbor[.]"").)  The Court cannot resolve disputes between her declaration and Plaintiffs' deposition testimony at this stage.  Moreover, the depositions indicate that various parties use different names for the same job sites, which makes it difficult to compare Krauss's declaration to the deposition testimony.

UEC also provides a sworn declaration from Sleep, its Director of Operations and Safety.  That declaration identifies the total number of safety videos completed by Heeg, Crampton, Kopke, Ayotte, Gay, Essenberg, and Winiarski, and the number of such videos completed before September 10, 2018.  (6/30/2023 Sleep Decl. ¶¶ 3-9, ECF No. 130-3.)  In their depositions,

however, Plaintiffs and Opt-In Plaintiffs disagreed with these numbers.  For instance, Ayotte testified that some videos he watched did not register on UEC's records.  (Ayotte Dep. 49.) Essenberg testified that he watched 20 to 30 or more videos (Essenberg Dep. 57, 62), whereas Sleep contends that he completed only 24.  Kopke testified that he watched about 30 videos (Kopke Dep. 213), whereas Sleep contends that he completed only 23.  Crampton testified that he watched 30 videos (Crampton Dep. 151-52), whereas Sleep contends that he completed only 25.  The Court cannot resolve these factual disputes at this stage.

Moreover, the Court will not attempt to parse which portions of which Plaintiffs' claims are time-barred and which are not.  For present purposes, it suffices to say that at least some portions of each Plaintiffs' FLSA claims are not time-barred.

### 2. Opt-In Plaintiffs

Opt-In Plaintiffs did not file their consent forms until May 31, 2023.  (*See* Notice of Opt-Ins, ECF No. 96.)  Thus, any claims arising on or after May 31, 2020, are timely, assuming willfulness by UEC.  UEC argues that some claims by Opt-In Plaintiffs are untimely under this date.  For instance, five of the Opt-In Plaintiffs ended their employment before May 31, 2020. And for those who were still employed after that date, UEC indicates that some of their claims involve hours worked before May 31, 2020.

Plaintiffs respond that the Court should apply equitable tolling to the claims of Opt-In Plaintiffs.  In *Clark*, the majority agreed (in separate concurring opinions) that equitable tolling is an appropriate remedy in FLSA cases, without "analyz[ing] the typical equitable tolling factors," "when the facts indicate a delay beyond the movants' control."  *Clark*, 68 F.4th at 1015 (Bush, J., concurring) (quoting *Betts v. Cent. Ohio Gaming Ventures, LLC*, 351 F. Supp. 3d 1072, 1077 (S.D. Ohio 2019)); *id.* at 1017 (agreeing with Judge Bush that "district courts should freely grant equitable tolling to would-be opt-in plaintiffs") (White, J., concurring).

Judge Bush noted that the reasons for tolling the statute of limitations in collective actions are "analogous" to those that justify tolling in the context of class actions. *Id.* at 1013. In both types of cases, the potential class members or plaintiffs hold no duty or responsibility to the case "until they receive notice." *Id.* at 1013-14. Also, failure to toll the limitations period could "frustrate" the purpose of such cases, which is to "channel[] litigation through one case[.]" *Id.* at 1014. In other words, enforcing the statute of limitations without tolling might encourage individual plaintiffs "to file disparate suits to protect their claims." *Id.* at 1013. Also, in a collective action, the "main purpose of the statute of limitations is met when defendants are informed of the claims by the initial plaintiffs and therefore glean the 'generic identities' of the plaintiffs and the 'subject matter and size' of the litigation." *Id.* at 1014.

Applying the principles in *Clark*, the Court will toll the statute of limitations from the date Plaintiffs filed their motion to conditionally "certify" a collective action. When analogizing collective actions to class actions, Judge Bush noted that members of a class action are given the benefit of the date of filing the class action complaint. *Id.* at 1013. He also noted, with concern, the fact that the opt-in plaintiffs in *Clark* did not receive notice until "361 days *after the filing of the complaint*." *Id.* at 1012. But here, the Court will not use the filing date of Plaintiffs' complaint to commence tolling because the FLSA clearly contemplates different start dates for the commencement of a claim in a collective action, one date for named plaintiffs (i.e., when they file their complaint with written consents attached) and a "subsequent date" for opt-in plaintiffs (i.e., when they file their written consents). 29 U.S.C. § 256(a)-(b). Thus, Congress clearly contemplated that opt-in plaintiffs would not receive the benefit of the same commencement date as named plaintiffs. Congress could have given opt-in plaintiffs the benefit of the same date as named plaintiffs, but it chose not to do so. Thus, the Court finds it appropriate to toll the limitations

28

period starting on November 15, 2021, which is when Plaintiffs asked the Court to approve the collective action.  This is also the date when Plaintiffs made clear to UEC the scope and size of the proposed claim by Opt-In Plaintiffs.  The Court did not grant that motion until several months later, but that delay was not within Opt-In Plaintiffs' control.  Similarly, after the Court granted Plaintiffs' motion, UEC resisted providing Plaintiffs with the names and addresses necessary to send notices to potential plaintiffs, causing further delay in sending notice to Opt-In Plaintiffs.  That additional delay was also not in Opt-In Plaintiffs' control.

UEC argues that, to the extent Plaintiffs faced delays, they should have filed a motion asking for equitable tolling at some point earlier in the case.  However, the Court is aware of no requirement that a party ask for equitable tolling before the statute of limitations defense is presented to the Court.  Thus, Plaintiffs' failure to ask for equitable tolling earlier in the case does not prevent Opt-In Plaintiffs from receiving that relief.

On the other hand, the Court will *not* toll the statute of limitations from the date the consent forms were to be returned to Plaintiffs' counsel on November 28, 2022, until the date that Plaintiffs filed them with the Court on May 31, 2023.  Plaintiffs' delay in filing the consent forms with the Court was *not* outside Opt-In Plaintiffs' control.  When Opt-In Plaintiffs signed and submitted their consent forms, they chose to be represented by Plaintiffs' counsel.  Their counsel withheld copies of those signed forms from UEC for several weeks[20] and then ignored the FLSA's clear statement that the claims of opt-in plaintiffs are deemed to commence on the "date on which [their] written consent[s] [are] filed in the court."  29 U.S.C. § 216(b).  Opt-In Plaintiffs are responsible

---

[20] At a hearing before the Court on May 30, 2023, UEC represented that it received copies of the consent forms in mid to late January 2023.

for the delays caused by their own attorneys.  *See Holland v. Florida*, 560 U.S. 631, 651-52 (2010) (noting that attorney negligence does not warrant equitable tolling).

Accordingly, for Opt-In Plaintiffs, the Court will toll the statute of limitations from November 15, 2021, to November 28, 2022, a period of one year and thirteen days.  When accounting for that period of tolling, Opt-In Plaintiffs are entitled to pursue claims arising on or after May 18, 2019, which is four years and thirteen days prior to May 31, 2023.  But because the Court has concluded that Plaintiffs have not shown willfulness with regard to the *per diem* violation, Opt-In Plaintiffs are entitled to pursue such claims only to the extent they arose on or after May 18, 2020.  Put another way, Opt-In Plaintiffs are deemed to have commenced their claims on May 18, 2022 (one year and thirteen days before May 31, 2023).

Review of Opt-In Plaintiffs' dates of employment indicate that all of them were employed by UEC for some period of time on or after May 18, 2019.  (*See* 2d Krauss Decl. ¶¶ 2-26.)  Thus, their dates of employment suggest that their FLSA claims are not time-barred.

On the other hand, Krauss avers that Opt-In Plaintiffs Bitnell, George, Render ended their employment with UEC before May 18, 2020.  (*Id.* at 3-4.)  Plaintiffs offer no evidence to the contrary.  Consequently, Bitnell, George, and Render are not entitled to damages for the *per diem* aspect of their FLSA claims.

UEC makes other arguments for why the Court should find that some or all of the other FLSA claims by the four Opt-In Plaintiffs who were deposed—Ayotte, Essenberg, Gay, and Winiarski—are time-barred, but those arguments do not account for the Court's discussion of equitable tolling in this Opinion, which results in a cut-off date of May 18, 2019, for most claims, rather than a later date calculated solely from the time Opt-In Plaintiffs filed their consent forms.

The Court will not attempt to parse the evidence to determine which portions of which claims survive under the earlier date.

In summary, UEC is entitled to summary judgment for the apprenticeship claim.  On the other hand, the claims of Opt-In Plaintiffs are not barred by waiver or the late submission of consent forms.  And except for *per diem* calculation, a jury could find that UEC's violations were willful.  After accounting for tolling, Opt-In Plaintiffs are deemed to have commenced their claims on May 18, 2022.  Using that date and the two-year statute of limitations for non-willful violations, the *per diem* claims by Opt-In Plaintiffs Bitnell, George, and Render are time-barred.  In addition, the *per diem* claim does not apply to Opt-In Plaintiffs Rich, Shank, and George.  However, other claims by Plaintiffs and Opt-In Plaintiffs' claims can proceed.  A jury will have to determine whether to apply a two or three-year statute of limitations to those claims.

## IV. SIMILARLY SITUATED

The FLSA permits collective actions to enforce the Act by plaintiffs "and other employees similarly situated."  29 U.S.C. § 216(b).  The Court made an initial determination of similarity between Plaintiffs and potential opt-in plaintiffs when permitting notice to certain employees or former employees of UEC.  Now that discovery has closed, the Court must make a "final similarity determination."  *Clark*, 68 F.4th at 1017 (Bush, J., concurring in part).  Plaintiffs bear the burden of showing that Opt-In Plaintiffs are similarly situated with Plaintiffs.  *Id.* at 1012; *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009) ("The lead plaintiffs bear the burden of showing that the opt-in plaintiffs are similarly situated to the lead plaintiffs."), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016).

The Court considers a "variety of factors" when determining similarity, including the "factual and employment settings of the individual[] plaintiffs, the different defenses to which the plaintiffs may be subject on an individual basis, [and] the degree of fairness and the procedural

impact" of permitting the case to proceed as a collective action.  *O'Brien*, 575 F.3d at 584 (quoting 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1807 (3d ed. 2005)).  The purpose of collective litigation is to "yield 'efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.'"  *Id.* (quoting *Hoffmann-La Roche,* 493 U.S. at 170).

The "similarly situated" requirement in the FLSA is "less stringent" than the requirements for class actions under the Federal Rules of Civil Procedure.  *Id.*  Plaintiffs can meet their burden by showing that "their claims [are] unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct."  *Id.*  In other words, Plaintiffs are not required to show "a 'unified policy' of violations."  *Id.*   Thus, they do not have to show that "a violation as to one particular plaintiff" means that "defendant violated any other plaintiff's rights under the FLSA."  *Id.* at 585.  Here, the factors point in favor of finding that Opt-In Plaintiffs are similarly situated with Plaintiffs.

### A. Factual and Employment Settings

Plaintiffs' factual and employment settings were similar to those of Opt-In Plaintiffs.  They all performed labor for UEC on various job sites.  Consequently, they were all subject to many of the same expectations and policies in terms of how to travel to the job site, when their compensable work time began, and how they recorded their time.  All Plaintiffs, and all Opt-In Plaintiffs who were deposed, testified that they worked on at least one job site more than sixty miles from the Shop, meaning that they would have received a *per diem* payment that was not adequately accounted for in their overtime pay.  In addition, all of them testified that they performed work that was not compensated, ostensibly because UEC generally considered only their time on the job site as compensable work.  For instance, all of them testified that they loaded materials or tools at the Shop before arriving at the job site, and many testified that they performed similar work

unloading materials or tools at the Shop after leaving the job site.  In addition, all of them testified that they were expected to complete online safety training modules, and all but one testified that they completed these modules on their own time, without compensation.

UEC argues that Plaintiffs' work situations and experiences differed depending on their manager or supervisor.  It points to the following testimony from Nolen:

> Jeremy [Tolliver], all management, they run each crew, their own crew differently. It's like four or five different companies in one company, and they all have different rules, and Jeremy said if I was looking at prints on the weekend, he would pay me, especially on the Hub job because of how large it is and how easy it is to miss a detail.

(Nolen Dep. 124.)  But Nolen's testimony does not indicate what particular rules or expectations differed from one manager to another.  Indeed, Nolen's assertion that Tolliver agreed to pay him for reviewing prints "on the Hub job because of how large it [was]" appears to be the exception that proves the general rule that UEC did not pay for that sort of work.   Also, contrary to Nolen's assertion that managers ran their crews differently, Project Manager Tolliver testified that foremen at UEC were "uniform" in how they managed their crews.  (Tolliver Dep. 81-82.)   Indeed, Plaintiffs and Opt-In Plaintiffs, who collectively worked for many different supervisors, generally reported the same issues with regard to unpaid work.  The consistency in their testimony supports Tolliver's assertion regarding the uniformity in UEC's practices.  Thus, this case is not like *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846 (N.D. Ohio 2014), in which the court "decertified" a collective action because the policies at issue "were implemented in a decentralized" and inconsistent manner "at dozens of facilities and [by] hundreds of individual managers." *Id.* at 855-56.

UEC also notes that only individuals employed as foremen reported reviewing prints or plans on their own time.  Not all Plaintiffs or Opt-In Plaintiffs were foremen.  Nevertheless, foremen share common claims with other Plaintiffs with regard to unpaid work, i.e., loading and

unloading materials at the Shop and completing training modules.  Thus, the foremen are similarly situated in that respect.  Moreover, the claims by the foremen regarding print review share a common theory with the other claims in that UEC apparently had a general policy of compensating its electrical workers only for labor performed on the job site.  Thus, evidence of that policy buttresses the claims regarding print review.  Consequently, proceeding as a collective action with the Opt-In Plaintiffs promotes greater efficiency in the presentation of evidence than would be achieved by requiring Opt-In Plaintiffs to proceed on their own.  *See Monroe*, 860 F.3d at 403 ("That an employer uses more than one method to implement a company-wide work 'off-the-clock' policy does not prevent employees from being similarly situated for purposes of FLSA protection.").

UEC indicates that each Plaintiff and Opt-In Plaintiff testified differently regarding the total amount of hours they worked and for which they were not paid.  For instance, they each worked at different job sites, some of which required them to review prints or to bring materials or tools to the site and some of which did not.  Also, the amount of time spent on these activities varied depending on the needs of the particular job or the Plaintiff's decision whether to perform them.  Regardless, Plaintiffs and Opt-In Plaintiffs can be similarly situated under the FLSA even when proof of the violations is "inevitably individualized and distinct."  *O'Brien*, 575 F.3d at 585. Moreover, this issue goes to the amount of damages to which each Plaintiff may be entitled. Individualized issues regarding damages generally do not prevent a case from proceeding as a *class* action, let alone a collective action.  *See Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) (noting that "individual damages calculations do not preclude class certification under Rule 23(b)(3)").

34

UEC also notes that various Plaintiffs and Opt-In Plaintiffs held different positions with different rates of pay.  Some were foremen, some were journeymen, and some were apprentices. "This is not a compelling argument [against proceeding as a collective action], because managers could also have been cheated by [defendant]."  *O'Brien*, 575 F.3d at 586.  Indeed, Plaintiffs' evidence indicates that all three types of employees—foremen, journeymen, and apprentices— suffered similar violations, at least in terms of (1) not receiving overtime pay at the proper rate due to the *per diem* miscalculation and (2) working hours off the clock for loading and unloading and for completing training modules.  The different rates of base pay simply mean that each Plaintiff might be entitled to a different damages calculation for the number of work hours they did not receive compensation.  As indicated above, those differences do not weigh against a finding that Opt-In Plaintiffs are similarly situated.

## B. Individualized Defenses

UEC argues that the statute of limitations will require individual analysis because some claims will fall outside that period.  However, that defense will apply to all Plaintiffs equally and to all Opt-In Plaintiffs equally.  A fact-finder would only need to consider whether the unpaid work fell within the appropriate time period.  That time period will become clear after the fact-finder determines whether UEC's conduct was willful.

UEC also argues that some Opt-In Plaintiffs are ineligible to participate due to waivers they signed or because they returned their consent forms late.  As discussed above, however, neither of those defenses is valid, so they do not prevent the case from proceeding as a collective action.

UEC raises other defenses, such as the absence of written policies directing Plaintiffs to not report work and the failure of Plaintiffs themselves to report their work hours, but those issues are applicable to all Plaintiffs and Opt-In Plaintiffs.  Also, those are not uncommon features of

FLSA actions.  *See, e.g.*, *Monroe*, 860 F.3d at 393 (approving a FLSA collective action involving a "company-wide time-shaving policy to force all technicians—either through direct orders or pressure and regardless of location or supervisor—to underreport overtime hours worked on their timesheets").  After all, the ultimate responsibility for keeping accurate records of employee work belongs to the employer, not the employee.  *See id.* at 399 (citing 29 U.S.C. § 211(c)).

In short, the individualized defenses do not weigh against proceeding as a collective action, particularly where, as here, Plaintiffs' claims are "unified by common theories of defendants' statutory violations[.]"  *O'Brien*, 575 F.3d at 584.

### C. Fairness & Procedural Impact

The last factor weighs in favor of proceeding as a collective action because the case "satisfies the policy behind FLSA collective actions and Congress's remedial intent by consolidating many small, related claims of employees for which proceeding individually would be too costly to be practical."  *Monroe*, 860 F.3d at 405.  Although there are variations in the number of claims and the circumstances of each Plaintiff and Opt-In Plaintiff, those differences do not render a collective action "unmanageable" and would not waste more judicial resources than trying the cases individually.  *Cf. Frye v. Baptist Mem'l Hosp., Inc.*, No. 07-2708, 2010 WL 3862591, at *9 (W.D. Tenn. Sept. 27, 2010) (decertifying collective action), *aff'd*, 495 F. App'x 669 (6th Cir. 2012).

### D. Conclusion

In summary, Plaintiffs have met their burden of showing that they are similarly situated with Opt-In Plaintiffs.  Accordingly, the Court approves the joinder of Opt-In Plaintiffs to this action and will deny UEC's motion to decertify.

## V. PLAINTIFFS' MOTION TO AMEND

Plaintiffs have filed a renewed motion to amend or clarify the Court's order regarding conditional certification of a collective action.  In particular, Plaintiffs ask the Court to expand or clarify the scope of its order to include (1) employees who were not properly compensated for time worked after the date Plaintiffs filed their complaint and (2) employees who UEC classifies as "Laborers" because they were not "electricians" and purportedly performed no electrical work.

Courts have authority and discretion to revise or reconsider their orders before entry of judgment, "as justice requires."  *See Rodgriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (quoting *Citibank N.A. v. Fed. Deposit Ins. Corp.*, 857 F. Supp. 976, 981 (D.D.C. 1994)).  Ordinarily, reconsideration or revision is appropriate "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice."  *Id.*

At issue is whether the Court should allow Plaintiffs to expand the collective action to send notice to additional employees.  Under *Clark*, in order for Plaintiffs to obtain approval to send notice to potential opt-in plaintiffs, Plaintiffs must "show a 'strong likelihood' that [these additional] employees are similarly situated to the [named] plaintiffs themselves."  *Clark*, 68 F.4th at 1011.

### A. Time Worked After Date of Complaint

The Court will deny Plaintiffs' request to expand the action to include the time period after the date of the complaint because Plaintiffs identify no evidence that UEC continued a practice of not compensating workers for time worked after that date.  Indeed, all Plaintiffs had stopped working for UEC several months *before* they filed their complaint.[21]  (*See* Compl. ¶¶ 2-8, ECF

---

[21] The same is true for all but six Opt-In Plaintiffs.  (*See* 2d Krauss Decl., ECF No. 119-2.)

No. 1.)  Plaintiffs cite deposition excerpts for Sleep and Tolliver that purport to support Plaintiffs' contention that UEC's policies have remained the same (*see* Pls.' Renewed Mot. 22, ECF No. 100); however, Plaintiffs did not attach those excerpts to their motion.  Plaintiffs also cite Peebles's sworn declaration, in which he stated that UEC's handbook "has been in effect since approximately June 2019."  (Peebles Decl. ¶ 11.)  While this statement does suggest that UEC's employee handbook remained the same for a few months after Plaintiffs filed their complaint, it does not suffice on its own to demonstrate a strong likelihood that UEC's *practices* remained the same, such that employees working for UEC after September 10, 2021, suffered the same or similar FLSA violations as Plaintiffs.

Finally, Plaintiffs cite Peebles's assertion that "UEC no longer pays a per diem as [of] October 8, 2021."  (Peebles Decl. ¶ 20.)  However, that statement does not indicate whether UEC continued to miscalculate the overtime rate after the date of Plaintiffs' complaint.

Alternatively, Plaintiffs argue that the Court's May 10, 2022 order approving the collective action improperly modified the scope of the relief they sought in their complaint.  Plaintiffs contend that, from the start, they intended to bring claims that encompassed ongoing conduct by UEC.  As evidence of this intent, they point to a few places in the complaint where they purported to assert claims on behalf of individuals "who *are* or were employed by Defendant[.]"  (*See* Compl. ¶¶ 10, 50 (emphasis added).)  However, when Plaintiffs asked for conditional certification, they did not use such language.  Instead, they provided the following description of the proposed class:

> [A] class of similarly situated individuals, known and unknown, who *were employed* by Defendant as electricians, including Apprentices, Journeymen, and Foremen (collectively, "Electrical Workers"), and who *were* deprived of overtime hours worked in excess of forty hours a week *over the course of the last three years*.

(Pls.' Br. in Supp. of Mot. for Conditional Certification 3, ECF No. 9 (emphases added).)  The Court adopted this description with one small modification.  Instead of saying "over the course of

the last three years," the Court referred to the three years prior to the filing of the complaint.  The Court did so in order to give Plaintiffs and potential plaintiffs the benefit of the maximum possible limitations period.  In other words, the Court gave Plaintiffs almost exactly what they requested.

At any rate, when seeking conditional certification, Plaintiffs did not provide evidence of ongoing violations by UEC.  According to affidavits attached to their motion for conditional certification, Plaintiffs had quit working for UEC several months before filing the complaint.  (*See* Pls.' Affs., ECF Nos. 9-1 to 9-7.)  Consequently, the Court had no evidentiary basis for extending the scope of the class to current employees, and the Court did not err by limiting the class in the way that it did.  Thus, Plaintiffs' argument that the Court improperly modified the complaint is not persuasive.

At this stage, even if Plaintiffs possessed evidence suggesting that the asserted violations continued beyond the date of their complaint, the Court would not expand the time period for the class because Plaintiffs have not been diligent in pursuing such claims.  As far as the timeframe is concerned, the scope of the class described in the Court's May 10, 2022, order is clear.  Plaintiffs did not challenge this description at the time of the order or for many months afterward.  Instead, they proceeded with discovery using the time limitation set forth in that order.  UEC responded in kind, repeatedly telling Plaintiffs that its discovery responses were limited to the timeframe in the Court's order.  Even in November 2022, when Plaintiffs told UEC that they had concerns with this timeframe, they did not act.  Instead, they waited until February 2023 to bring a motion to amend the Court's order.

While Plaintiffs kept silent, the case proceeded, the deadline for returning consent forms passed, and the discovery period ended.  Expanding the timeframe for the claims at issue in this case would effectively push this case back to the start of the discovery process.  That delay would

Case 1:21-cv-00796-HYJ-RSK   ECF No. 145,  PageID.4624   Filed 11/06/23   Page 40 of 44


prejudice Plaintiffs as well as UEC, all of whom have an interest in the efficient resolution of the many claims that are already before the Court. As such, the delay would run counter to the fairness and procedural concerns this Court must consider when approving a collective action. In other words, justice does not require amending the class definition to expand the timeframe to include violations occurring after Plaintiffs filed their complaint. Accordingly, the Court will deny Plaintiffs' request to the extent they seek to add potential plaintiffs with claims arising after the date of the complaint.

### B. Laborers

Plaintiffs also ask to amend the class to include employees that UEC refers to as "Laborers." The Court will grant this request because Plaintiffs have made a sufficiently strong showing that laborers are likely to be similarly situated with Plaintiffs themselves. Indeed, UEC contends that Marius Richardson, one of the named plaintiffs, worked as a laborer. Richardson testified that, like other Plaintiffs, he did not receive compensation for loading and unloading materials at the Shop, or for completing online training modules. (M. Richardson Dep. 110, 144-46.) He also worked at a job site that was more than 60 miles from the Shop, meaning that he would have received a *per diem* payment. (*Id.* at 209.) Also, Peebles averred in his sworn declaration that laborers are "field employees," meaning that, like apprentices and journeymen, they "perform electrical work at the jobsites to which they are assigned" and they "report directly to their assigned jobsite each day." (Peebles Decl. ¶ 5.) Accordingly, it is likely that they would have experienced the same treatment with regard to performing offsite work for which they did not receive compensation.

UEC contends that laborers are not similarly situated because they have a different job title, receive a different rate of pay, and are not licensed or trained in the same manner as apprentices or journeymen. The Court addressed differences in pay and job title when discussing whether Opt-

In Plaintiffs are similarly situated.  In short, those differences do not weigh against approving a collective action.  It is not clear why differences in training or licensure are relevant.  Thus, UEC's arguments are not persuasive.

In addition, Plaintiffs have shown that they are not entirely responsible for the failure to include laborers at the outset.  Early on in the case, before the Court approved notice to potential opt-in plaintiffs, Peebles submitted his sworn declaration making contradictory assertions about laborers.  He described them as "electrical workers" who "perform electrical work *and* as "non-electrical workers who . . . do not perform any electrical tasks[.]"  (Peebles Decl. ¶¶ 3-5.)  When approving the collective action, the Court used the term "electrician" in its description of the class because it was consistent with Plaintiffs' request.  The Court did not define that term; however, it was clear from Plaintiffs' complaint and from the Court's May 10, 2022, opinion, that the term was a synonym for electrical worker, as both documents repeatedly referred to UEC's "electrical workers."  (*See, e.g.*, 5/10/2022 Op. 1, 3, 5-8, ECF No. 17 (referring to "electrical workers").)  The Court did note Peebles's assertion that laborers are both "electrical worker[s]" and "non-electrical workers" (*id.* at 2 n.1), but at the time the Court was not aware of any relevant distinction between electrical workers, non-electrical workers, and electricians.

During discovery, it became clearer that laborers were not meaningfully different from Plaintiffs.  For instance, Nolen testified that laborers performed electrical work on job sites.  (Nolen Dep. 47, 201.)  And although UEC insists that Marius Richardson was a laborer, he testified to performing the same uncompensated work as other Plaintiffs.  Similarly, Tolliver testified that, although laborers did not perform electrical work, they would sometimes perform the same tasks on the job site as apprentices and foremen, such as "moving materials."  (Tolliver Dep. 24-25, 332.)  Finally, contrary to UEC's insistence that laborers are not electrical workers, UEC's

President, Scott Flegler, signed a notarized letter stating that Marius Richardson "worked a total of 1346.0 hours performing electrical wiring" for UEC.  (10/29/2020 Letter, ECF No. 102-4, PageID.2267.)

Despite all this evidence, UEC decided not to disclose to Plaintiffs the identities of employees it classified as laborers based on its undisclosed and debatable position that such employees did not fall within the scope of the class defined by the Court because they "do not perform electrical tasks and are not electricians."  (Def.'s Resp. to Renewed Mot. to Am. 7, ECF No. 116.)  As support for its position, UEC continues to rely on the declaration by Peebles, which contradicts itself on this issue.  (*Id.*)  Apparently, UEC did not reveal its position to Plaintiffs until November 17, 2022, after Plaintiffs had already sent notices to potential opt-in plaintiffs.  (*See* 11/17/2022 Cessante Email, ECF No. 48-3, PageID.799.)[22]  In early February the following year, Plaintiffs asked this Court to amend or clarify the definition of the class to include laborers.

UEC argues that it will be prejudiced by allowing Plaintiffs to bring laborers into the class at this late stage of the case.  However, UEC is responsible for much of that prejudice.  Instead of resolving a debatable issue through motion practice, it attempted to foreclose the issue through discovery.  Accordingly, in the interest of justice to employees who could have received notice but did not, the Court will permit Plaintiffs to send notice of the suit to individuals employed by UEC as laborers, and who were deprived of overtime for hours worked in excess of forty hours a week over the course of the three years before Plaintiffs filed their complaint.  The Court will hold a scheduling conference to determine how to proceed.

---

[22] UEC has apparently provided Plaintiffs with a list of laborers, though when it did so is unclear.  (*See* Pls.' Br. in Supp. of Renewed Mot. to Am. 5, ECF No. 100 (noting that "Defendant supplemented the unredacted list with 'Laborers[.]'"); 11/22/2022 Cessante Email, ECF No. 116-9, PageID.3297 ("[W]e will provide Plaintiffs with a list of Laborers employed by UEC for the class period. . . . I will get that information to you later today.").)

## VI. CONCLUSION

For the reasons stated above, the Court finds that Plaintiffs are similarly situated with Opt-In Plaintiffs and approves their joinder to this action.  Accordingly, the Court will deny UEC's motion to "decertify" the collective action.

The Court will grant in part and deny in part Plaintiffs' renewed motion to amend or clarify the scope of the class.  The Court will allow Plaintiffs to send notice to individuals employed by UEC as laborers, and who were deprived of overtime for hours worked in excess of forty hours a week over the course of the three years before Plaintiffs filed their complaint.  The Court will not expand the class to include events occurring after the date of the complaint.

The Court will grant UEC's motion for partial summary judgment in part and deny it in part.  The waivers signed by Opt-In Plaintiffs are not enforceable.  Plaintiffs commenced their claims on September 10, 2021.  Consequently, that date is the relevant date for calculating the two or three-year statute of limitations for their claims.  Opt-In Plaintiffs are deemed to have commenced their claims on May 18, 2022, so that date is the relevant date for calculating the two or three-year statute of limitations for their claims.

There is no genuine dispute that UEC's failure to include the *per diem* payment in the overtime rate was not willful.

There is also no genuine dispute that the *per diem* claim does not apply to Opt-In Plaintiffs Rich, Shank, and George, so the Court will dismiss that aspect of their claim.

There is also no genuine dispute that claims by Opt-In Plaintiffs Bitnell and Render regarding the *per diem* calculation are time-barred, so the Court will dismiss that part of their claims.

There is no genuine dispute that neither Plaintiffs nor Opt-In Plaintiffs assert a viable claim with respect to apprenticeship training, so the Court will dismiss that aspect of their FLSA claims.

43

Finally, there is no genuine dispute of fact regarding the *dates* on which Opt-In Plaintiffs were employed or when UEC worked on particular job sites. (*See* 2d Krauss Decl., ECF No. 119-2.)

An order will enter consistent with this Opinion.


Dated: <u>November 6, 2023</u>                    <u>/s/ Hala Y. Jarbou</u>
                                                HALA Y. JARBOU
                                                CHIEF UNITED STATES DISTRICT JUDGE